UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT J. TREASE,

    Applicant,

v.                                      CASE NO. 8:11-cv-233-SDM-TGW
                                                        **DEATH PENALTY**

SECRETARY, Department of Corrections,

    Respondent.
_____/

## **AMENDED ORDER**

      Trease applies under 28 U.S.C. § 2254 for the writ of habeas corpus (Doc. 1) and challenges the validity of both his conviction for murder and his sentence of death. An earlier order both determined that the application is time-barred and permitted Trease an opportunity to present the factual and legal basis for his asserting "actual innocence" to overcome the limitation. (Doc. 26) Another order (Doc. 43) dismisses Trease's application after determining that his asserted actual innocence fails to entitle him to federal review. Trease moved (Doc. 70) under Rule 59(e), Federal Rules of Civil Procedure, and he argued that the latter order commingles the two different burdens for showing entitlement to federal review based on actual innocence, specifically, the lesser burden required to overcome a procedural default based on actual innocence and the greater burden required to prove a "free standing" claim of actual innocence. To avoid potential confusion, the district court granted (Doc. 72) the Rule 59(e) motion and vacated the earlier order (Doc. 43) of dismissal.

The earlier order of dismissal was divided into four sections. The first section addresses Trease's *pro se* attempt to discharge counsel and the second section discusses actual innocence as a gateway to review a procedurally defaulted or untimely constitutional claim. The third section evaluates Trease's evidence of actual innocence, and the last section determines that Trease is entitled to no relief. Trease's Rule 59(e) motion challenged the last two sections but not the first two sections. Because the earlier order of dismissal was vacated, the following order of dismissal re-states (without material alteration) the first two sections and amends the last two sections to eliminate prospective confusion about Trease's lack of entitlement to relief under the actual innocence exception for his procedurally defaulted and time-barred claims.

### I.

### TREASE'S *PRO SE* ATTEMPT TO DISCHARGE COUNSEL

Four times Trease changed his mind during the state proceedings, in addition to changing his mind in this federal proceeding. First, Trease disavowed counsel's pursuing post-conviction relief, which caused both the delay of state post-conviction review and the loss of tolling the federal one-year limitation. As thoroughly discussed in the earlier order (Doc. 26 at 4–6), the present action is untimely because the limitation was not tolled. Second, after the one-year deadline passed Trease changed his mind about pursuing state post-conviction review, and the state court re-instated his motion for post-conviction relief.

Third, after having cooperated in the post-conviction proceedings and while the ensuing appeal was pending, Trease moved to discharge counsel and withdraw his

appeal. As a consequence, Florida's supreme court relinquished jurisdiction for the post-conviction court to determine whether Trease understood the impact of withdrawing his appeal. As reported at *Trease v. State*, 41 So. 3d 119, 121–22 (Fla. 2010) ("*Trease II*"), after thoroughly questioning him the post-conviction court both ensured Trease understood the consequences of withdrawing his appeal and permitted the withdrawal of the motion for post-conviction relief.

Fourth, on the subsequent mandatory review of the post-conviction court's permitting Trease to withdraw his challenge to his conviction and sentence, Trease again changed his mind and asked Florida's supreme court to re-instate his appeal, a request rejected in *Trease II*, 41 So. 3d at 126 (brackets original).

> If this Court were to allow Trease to reinstate his post-conviction proceedings based upon a mere change of mind, there would be nothing to stop Trease from changing his mind again at a later date. In fact, based upon Trease's history, this is a likely scenario. Then, the trial court would be required to conduct another *Durocher* hearing because Trease has a right to waive post-conviction counsel and proceedings. Thereafter, Trease could again change his mind, and the trial court would be required to reinstate the post-conviction proceedings. The cycle could continue indefinitely. *Cf. Waterhouse v. State,* 596 So. 2d 1008, 1014 (Fla. 1992) ("[A] defendant may not manipulate the proceedings by willy-nilly leaping back and forth between the choices [of self-representation and appointed counsel]." (quoting *Jones v. State,* 449 So. 2d 253, 259 (Fla.1984))).

After accepting the post-conviction court's determination that he was competent to withdraw his appeal, *Trease II* dismisses Trease's appeal from the denial of post-conviction relief.

Trease commenced this federal action with the same appointed counsel as in the state post-conviction proceedings. After the earlier order determined the untimeliness

- 3 -

of this action and after the actual-innocence issue was briefed, Trease announced another change of mind and both advises that he has dismissed counsel and requests the dismissal of this action. (Doc. 36) The respondent moves (Doc. 37) to determine whether Trease proceeds *pro se* or is represented by appointed counsel. In response, Trease again moves to "discharge counsel and to discharge appeal." (Doc. 38) Trease's appointed counsel both asserts that he remains as counsel representing Trease until relieved by court order and encourages the district court to ignore the *pro se* papers. (Doc. 40) First, responding to counsel's arguments, Trease *pro se* files an affidavit (Doc. 41), in which he again declares that he discharges counsel. Second, Trease *pro se* moves to compel (Doc. 42) a ruling on his earlier motion to "discharge counsel, and to discharge appeal and to uplift stay without delay." The district court had paused to await from Trease another change of mind, but (thus far) Trease persists in the demand to discharge counsel. (Doc. 41 and 42) This case is ripe for decision on whether Trease is entitled to a review of his conviction and sentence based on his assertion of actual innocence. *Trease II* recognizes the need to prevent a petitioner's "manipulat[ing] the proceedings by willy-nilly leaping back and forth between the choices . . . ." Given Trease's erratic (and arguably manipulative) history, prudence commends not discharging counsel during this mature phase of his action and at this decisive moment in his action.

## II.

## ACTUAL INNOCENCE GATEWAY

"We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). Proving actual innocence is rare and, as explained in *Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1010–11 (11th Cir. 2012), a claim of actual innocence can occur in a habeas proceeding (1) when actual innocence is asserted as a "freestanding" constitutional claim, (2) when actual innocence is asserted as a gateway to review a procedurally defaulted constitutional claim, and (3) when actual innocence is asserted as a gateway to review an untimely constitutional claim.

> Our cases refer to an "actual innocence" claim in at least three different types of habeas cases. In the first type, a petitioner's actual innocence is itself the constitutional basis of the habeas petition. *See Herrera v. Collins,* 506 U.S. 390, 400, 113 S. Ct. 853, 860, 122 L. Ed. 2d 203 (1993) (holding that no federal habeas relief is available for freestanding, non-capital claims of actual innocence); *Jordan v. Sec'y, Dep't of Corr.,* 485 F.3d 1351, 1356 (11th Cir. 2007) (same). This is not Rozzelle's type of claim.
>
> In the other two types of actual innocence claims, the petitioner's assertion of innocence is not itself a freestanding claim, but merely serves as a "gateway" to get the federal court to consider claims that the federal court would otherwise be barred from hearing. "To successfully plead actual innocence, a petitioner must show that his conviction resulted from 'a constitutional violation.'" *Johnson,* 513 F.3d at 1334[1] (quoting *Schlup v. Delo,* 513 U.S. 298, 327, 115 S. Ct. 851, 867, 130 L. Ed. 2d 808 (1995)).
>
> In the second type, a petitioner's actual innocence serves as a gateway to consideration of constitutional claims procedurally

---

[1] *Johnson v. Fla. Dep't of Corr.*, 513 F.3d 1328, 1333 (11th Cir. 2008).

defaulted in state court, such as failure to exhaust state remedies, failure to satisfy state filing requirements, *et cetera*. *See Johnson v. Alabama,* 256 F.3d 1156, 1171 (11th Cir. 2001) (explaining that claim of actual innocence must be supported by "reliable evidence not presented at trial" (internal quotation mark omitted)); *see also Schlup,* 513 U.S. at 324, 115 S. Ct. at 865 (holding that for habeas court to consider procedurally barred constitutional claims, petitioner must present "new reliable evidence" of actual innocence). To bypass such a procedural bar, a petitioner must show *either* (1) cause and prejudice *or* (2) a miscarriage of justice, or "actual innocence." *Schlup,* 513 U.S. at 314–15, 115 S. Ct. at 860–61. The actual innocence exception to the procedural bar is not meant to remedy ordinary errors in criminal judgments but is narrowly reserved for only "fundamental miscarriage[s] of justice." *Id.* at 315, 115 S. Ct. at 861. To overcome procedural default through a showing of actual innocence, the petitioner must present "reliable evidence . . . not presented at trial" such that "it is more likely than not that no reasonable juror would have convicted him of the underlying offense." *Johnson,* 256 F.3d at 1171 (quoting *Schlup,* 513 U.S. at 324, 327, 115 S. Ct. at 865, 867 (internal quotation mark omitted)).

In the third situation, a habeas petitioner claims his actual innocence should serve as a gateway to consideration of constitutional claims time-barred under AEDPA's one-year limitation period. *See* 28 U.S.C. § 2244(d); *Johnson,* 513 F.3d at 1333–34; *Arthur,* 452 F.3d at 1244–46. This is Rozzelle's type of claim. Because the standards for actual innocence in cases of procedural default and untimely federal habeas petitions derive from the Supreme Court's decision in *Schlup,* we have at times conflated these two case types. *See Arthur,* 452 F.3d at 1245 (applying the concept of the actual innocence exception to "procedural bar" to the *Arthur* case involving an AEDPA-time-barred § 2254 petition). Therefore, like the actual innocence exception for procedural default, the alleged exception for AEDPA untimeliness would require the petitioner (1) to present "new reliable evidence . . . that was not presented at trial," *Arthur,* 452 F.3d at 1245 (quoting *Schlup,* 513 U.S. at 324, 115 S. Ct. at 865), and (2) to show "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" in light of the new evidence. *Johnson,* 513 F.3d at 1334 (quoting *Schlup,* 513 U.S. at 327, 115 S. Ct. at 867); *see also House v. Bell,* 547 U.S. 518, 538, 126 S. Ct. 2064, 2077, 165 L. Ed. 2d 1 (2006).

As *Rozzelle* explains, the actual innocence burden is the same for claims that are either procedurally defaulted or time-barred. Trease's situation is in both the second and the third situations described in *Rozzelle* because his claims are both procedurally defaulted and time-barred.

## A. Dual Preclusion to Federal Review

### 1. Exhaustion and Procedural Default

The second situation that *Rozzelle* identifies involves a procedurally defaulted claim. A petitioner must present each claim to a state court before raising the claim in federal court. "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995), *quoting Picard v. Connor*, 404 U.S. 270, 275 (1971). *Accord Rose v. Lundy*, 455 U.S. 509, 518–19 (1982) ("A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error."). When he changed his mind the second time, Trease forced the withdrawal of his post-conviction appeal. As a consequence, in dismissing the appeal (1) *Trease II* affirmed the post-conviction court's granting Trease's request to withdraw his challenge to his conviction and sentence, (2) Trease's abandonment of his appeal precluded Florida's supreme court from reviewing the merits of his post-conviction claims, and (3) Trease failed to exhaust his available state court remedies. *See Upshaw v. Singletary*, 70 F.3d

576, 578 (11th Cir. 1995) ("[T]he applicant must have fairly apprised the highest court of his state with the appropriate jurisdiction of the federal rights which allegedly were violated.").

The failure to properly exhaust each available state court remedy causes a procedural default of the unexhausted claim. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999) ("Boerckel's failure to present three of his federal habeas claims to the Illinois Supreme Court in a timely fashion has resulted in a procedural default of those claims."). To overcome the procedural default, Trease must establish either (1) "cause for the default and prejudice attributable thereto" or (2) "that failure to consider [the defaulted] claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989).

To demonstrate "cause" for his procedural default, Trease must justify his failure to comply with Florida's procedural rules. In general, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules." *Murray v. Carrier*, 477 U.S. at 488. *See Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995). Even if he shows cause for his procedural default, Trease must show prejudice arising from the alleged constitutional error. A petitioner must show that he suffered actual prejudice, "not merely that the errors of the trial created a <u>possibility</u> of prejudice, but that they worked to his <u>actual</u> and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis original). *Accord Hollis v. Davis*,

- 8 -

941 F.2d 1471, 1480 (11th Cir. 1991).  To excuse his procedural default Trease must show both "cause" and "prejudice."  Trease cannot meet the "cause" requirement.  Rather than something external to the defense, Trease himself precluded his exhausting the state court remedies when he withdrew his motion for post-conviction relief and abandoned his appeal.

As an alternative to showing "cause and prejudice," Trease must show that dismissal of his procedurally defaulted grounds will result in a "fundamental miscarriage of justice," an especial difficulty because Trease must demonstrate "actual innocence" of the crime of conviction.  *See Smith v. Murray*, 477 U.S. 527, 537 (1986) (citing *Murray v. Carrier*, 477 U.S. at 496).  *See also Engle v. Isacc*, 456 U.S. 107, 134–35 (1982), and *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995)[2] (denying a certificate of probable cause and holding that a petitioner must show "as a factual matter that he did not commit the crime of conviction.").  Additionally, to meet the "fundamental miscarriage of justice" exception, Trease must show constitutional error coupled with "new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  Trease's attempt to show his actual innocence is discussed below.

---

[2] Unless later superseded by Eleventh Circuit precedent, a Fifth Circuit decision issued before October 1, 1981, binds this court.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

### 2. Statute of Limitation

The third situation that *Rozzelle* identifies involves an untimely claim. The earlier order (Doc. 26) determines that Trease's application is untimely. As *Perkins*, 133 S. Ct. at 1928 (brackets original), explains, proof of actual innocence will overcome the statute of limitation and the burden is the *Schlup* standard:

> "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup,* 513 U.S., at 329, 115 S. Ct. 851; see *House,* 547 U.S., at 538, 126 S. Ct. 2064 (emphasizing that the *Schlup* standard is "demanding" and seldom met).

### B. Forfeiture of Federal Review

Trease abuses the judicial process by repeatedly changing his mind. *See Trease II*, 41 So. 3d at 126 (characterizing a similar situation as "willy-nilly leaping back and forth") (quoting *Jones v. State,* 449 So. 2d 253, 259 (Fla. 1984)). Trease asserts no entitlement to a new limitation under Section 2244(d)(1)(D) based on "newly discovered evidence" because that provision requires the exercise of due diligence. *See Johnson v. United States*, 544 U.S. 295, 310 (2005) (rejecting entitlement to a new limitation for "newly discovered evidence" because of the lack of due diligence). Fortunately for Trease, due diligence is not a threshold requirement for showing actual innocence. *Perkins*, 569 U.S. at 399 ("[W]e reject the State's argument that habeas petitioners who assert convincing actual-innocence claims must prove diligence to cross a federal court's threshold . . . ."). Nevertheless, a petitioner's diligence in asserting a claim of actual innocence is "part of the assessment [in determining]

whether actual innocence has been convincingly shown . . . ." *Perkins*, 569 U.S. at 399.

Lastly, *Perkins*, 569 U.S. at 400, explains that the focus is on the evidence.

> Focusing on the merits of a petitioner's actual innocence claim and taking account of delay in that context, rather than treating timeliness as a threshold inquiry, is tuned to the rationale underlying the miscarriage of justice exception — i.e., ensuring "that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera*, 506 U.S., at 404, 113 S. Ct. 853.

### III.

### TREASE'S EVIDENCE OF ACTUAL INNOCENCE

As explained above, Trease's burden is to both "present 'new reliable evidence . . . that was not presented at trial,' [and] show 'that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt' in light of the new evidence." *Rozzelle*, 672 F.3d 1000, 1011 (quoting *Schlup*, 513 U.S. at 327). Moreover, in determining whether the burden is met, "*Schlup* makes plain that the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 328). And *House*, 547 U.S. at 538, further explains that the *Schlup* standard is difficult to meet because "[a] petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt, or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."

## A. The Evidence at Trial

Whether Trease can meet this burden requires an understanding of the evidence that supports Trease's conviction. Some of the operative facts supporting the conviction, as found in *Trease v. State*, 768 So. 2d 1050, 1052 (Fla. 2000) ("*Trease I*"), are as follows:

> On August 17, 1995, Hope Siegel arranged a date with the victim, Paul Edenson, so Trease could learn where the victim hid his safe. When Siegel arrived at the victim's home they talked for a while, after which Siegel departed and walked to Trease's location, and told him that the victim did not have a safe. Trease followed her back to the victim's house where he surprised the victim and battered him in an effort to get the sought-after information. Upon the victim's insistence that he did not have a safe in the house, Trease told Siegel to get a gun which Trease put to the victim's head as he continued the questioning. The victim remained uncooperative so Trease fired a nonlethal bullet into his head and then sent Siegel for a knife with which he cut the victim's throat. An expert medical witness testified that the victim would have died a few minutes later.
>
> Subsequent to their arrest, Trease denied any knowledge of the crime, but Siegel made a taped statement implicating both. The State had no physical evidence tying Trease to the crime, so Siegel's testimony was critical at trial. The jury found Trease guilty of first-degree murder, burglary, and robbery with a firearm.

The findings supporting the death sentence, as determined in *Trease I*, 768 So. 2d at 1052–53, are as follows:

> During the penalty phase of the trial, the State submitted aggravating evidence that Trease had been previously convicted of several violent felonies; that the murder was committed to facilitate a burglary or robbery, to gain a pecuniary interest, and to avoid lawful arrest; and that the murder was heinous, atrocious, and cruel. Trease submitted mitigating evidence that he was abused as a child, that he adjusted well to incarceration, that he helped prevent the suicide of an inmate, and that Siegel had received a disparate sentence. The trial court imposed the death

>sentence[FN1] in compliance with the jury's eleven-to-one vote and Trease filed the instant appeal.
>
>>FN1. The trial court found the following statutory aggravating factors: (1) previous violent felonies against persons; and that the murder was committed (2) while engaged in a burglary or robbery, (3) to avoid arrest, and (4) for pecuniary gain; and (5) the murder was heinous, atrocious or cruel. Based on Trease's evidence, the trial court found three nonstatutory mitigating factors and assigned weight to each factor: (1) Trease's abuse as a child — "considerable" weight; (2) Trease adjusted well to incarceration and helped prevent an inmate suicide — "little or no" weight; and (3) Siegel's disparate sentence — "little" weight. The trial court gave "great weight" to the jury's recommendation, and concurred "with the jury's finding that the aggravating circumstances found to exist outweigh[ed] the mitigating circumstances."

### B. The Proposed New Evidence

Trease's supposed compelling new evidence of actual innocence is less than compelling. The new evidence challenges both the validity of the state's testimony on the bullet analysis and the veracity of Hope Seigel — the co-defendant and whose testimony *Trease I* characterized as "critical."

**1. Carbon Based Lead Analysis ("CBLA")**

Police recovered bullet fragments from the crime scene. The fragments were, however, too small to use the usual ballistics tests to determine if a particular gun fired the bullet. Instead, the fragments were subjected to a "carbon based lead analysis" test, which examines the metallurgical characteristics of the lead to determine if two bullets were made from the same melting process. At trial the prosecution presented the testimony of a Federal Bureau of Investigation ("FBI") analyst, who testified that a

CBLA test showed that the lead from the bullet fragments contained the same metallurgical characteristics as the lead in the bullets recovered from the firearm that Trease and Seigel possessed. The analyst testified "that the bullet fragments and the bullet core of the Federal cartridge were all manufactured from the same source of lead as the Federal ammunition plant in Minnesota." (Respondent's Exhibit A27 at 2422) This testimony was presented in 1996. In closing arguments the prosecutor argued that the CBLA test corroborated Seigel's testimony by matching the bullets fragments from the crime scene to the firearm.[3] In 2005 the FBI revealed that it had suspended using the CBLA test because the test fails to account for the total number of bullets made during the melting process and the consequent possible misleading relevance of the testimony.

The FBI's suspending use of the CBLA test is, by itself, no evidence of actual innocence. The possible prejudicial impact of the now discontinued test is in the prosecution's reliance on the test to corroborate Seigel's testimony.

**2. Veracity of Hope Seigel**

Trease argues that Seigel alone was the killer. Trease names a mental health expert to whom Seigel allegedly confessed to the killing and identifies several women who would testify that, while in jail, Seigel confessed to them that she alone killed the victim. These witnesses asserted also that Seigel offered conflicting stories about the incident. Trease's defense at trial was that Seigel, and not him, was responsible for the

---

[3] "The shell casing found in her car was fired from that gun. It was a Federal brand that killed him. The FBI told you that. You heard the metallurgy." (Respondent's Exhibit A29 at 2704)

killing. At trial Trease presented the testimony of one of the witnesses he contends provides evidence of actual innocence.[4] Trease's attack on Seigel's credibility is largely cumulative to defense counsel's similar attack on her credibility at trial.

## **C. Not Proof of Actual Innocence**

Trease contends that Seigel's uncorroborated testimony blaming the murder on Trease was the only evidence against him. Although characterized as "critical" in *Trease I*, the prosecution presented much evidence that independently corroborated Seigel's account of the gruesome slaying, evidence on which a jury could reasonably base a conviction. Several witnesses placed Trease with Seigel near the scene of the murder.[5] The medical examiner testified (1) the injury to the victim's eye was caused by "a severe blow, a violent blow to the face, consistent with a fist blow, that would have carried a lot of force," (2) that the victim's throat was cut three times with a serrated knife, which required the use of a greater amount of strength than a "razor-sharp-edged knife" would require, and (3) that the murderer was someone who was either very strong and muscular or someone who was heavyset. (Respondent's Exhibit A22 at 1563–72) The medical examiner agreed that his findings were consistent with the following scenario:

> That [the victim], immediately prior to his death, was punched in the face by a strong left-handed man, that [the victim] fell back to the floor hitting his head, and with [the victim] lying on his stomach on the floor with the right side of his face facing the ceiling, a gun was placed to the right side of his head and he was

---

[4] Another of the witnesses Trease now identifies refused to testify at trial.

[5] Also, Trease and Seigel were arrested together out of state.

- 15 -

> shot, and immediately after that, his head was pulled back with
> the right hand of the perpetrator and this perpetrator, using his
> left hand, with forceful slices [and] using his left hand went
> across his neck in forceful strokes at least three times.

(Respondent's Exhibit A22 at 1574)  The jury heard testimony that Trease had reached the rank of "black belt" in Karate and that he had demonstrated how to kill someone by cutting their throat.[6]  A jury could have found (1) that Trease — who is left-handed and who had both claimed and demonstrated his martial arts' skills — had the requisite physical capabilities to inflict the described injuries whereas Seigel, who is right-handed, lacked the physical capabilities, and (2) that Trease knew how to cut someone's throat.

## IV.

## CONCLUSION

The admonition in *Perkins*, 569 U.S. at 400, that the focus is on the evidence, bears repeating:

> Focusing on the merits of a petitioner's actual innocence claim
> and taking account of delay in that context, rather than treating
> timeliness as a threshold inquiry, is tuned to the rationale
> underlying the miscarriage of justice exception – i.e., ensuring
> "that federal constitutional errors do not result in the incarceration
> of innocent persons." *Herrera*, 506 U.S., at 404, 113 S. Ct. 853.

This focus inures to Trease's benefit because the restrictions to federal review under Section 2254 are inapplicable.  Trease presented his evidence of actual innocence to

---

[6] Jeffrey Colson testified that Trease had (1) claimed to be a "black belt" in Karate and showed some techniques, one of which was "visually very stunning," and (2) demonstrated "how an individual might take out someone else's throat by moving the knife across the throat." (Respondent's Exhibit A27 at 2442–44)

the post-conviction court, which conducted an evidentiary hearing and determined that the same evidence Trease presents here was sufficient to prove neither ineffective assistance of counsel nor actual innocence nor to qualify as "newly discovered evidence." (Respondent's Exhibit B5 at 887–909) If Trease had not withdrawn his petition and if his appeal ended with a denial of relief, the state court's findings of fact and determinations of law would receive a deferential review in federal court under Section 2254. If due diligence was part of the "threshold inquiry" to determine eligibility for actual innocence (*Perkins* specifically precludes requiring due diligence in an actual innocence inquiry) Trease could claim no entitlement to actual innocence because his repeatedly "changing his mind" eviscerates any assertion of due diligence. To the extent that *Perkins* permits "taking account of delay in th[e] context" of "the merits of [his] actual innocence claim," Trease's repeatedly "changing his mind" has impeded an orderly state post-conviction review process and, in particular, the state's determination of the same facts that he presents here as evidence of actual innocence — a state court determination that would receive deferential treatment on federal review under Section 2254. Trease's "untimeliness, although not an unyielding ground for dismissal of a petition, does bear on the credibility of evidence proffered to show actual innocence." *Perkins*, 569 U.S. at 401. Trease's repeatedly "changing his mind," that is, his failure to persist in pursuing his asserted actual innocence, casts doubt on the credibility of his evidence of actual innocence.

Nevertheless, the district court has considered each of Trease's arguments and all the evidence proffered to support entitlement to actual innocence. *Perkins*, 569 U.S. at

386, "caution[s] . . . that tenable actual innocence gateway pleas are rare . . . ." This is because "[t]he gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Perkins*, 569 U.S. at 401 (quoting *Schlup*, 513 U.S. at 316). Trease argues both that the new evidence is proof Seigel was the lone killer and that only her testimony ties Trease to the slaying. To the contrary, the independent evidence described above corroborates Seigel's testimony. Trease's argument for actual innocence is that Seigel's trial testimony — that Trease committed the slaying — is not credible, yet he bases his claim of actual innocence on her credibility, specifically her alleged hearsay statements to others (many of whom also have questionable credibility). *See, e.g., Moore v. Quarterman*, 534 F.3d 545, 565 n.17 (11th Cir. 2008) ("To show 'actual innocence,' as with showing 'actual prejudice,' requires something more than pointing to '[a] mere possibility of prejudice,' because a speculative claim 'will not satisfy the actual prejudice prong of the cause and prejudice test, *much less demonstrate actual innocence*.' ") (quoting *United States v. Shaid*, 937 F.2d 228, 236 (5th Cir. 1991) (italics original)). Trease fails to meet his burden under *Schlup*, 513 U.S. 327, which is admittedly difficult:

> [W]e hold that the *Carrier* "probably resulted" standard . . . must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims.
>
> The *Carrier* standard requires the habeas petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." 477 U.S., at 496, 106 S. Ct., at

> 2649–2650. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice.

Trease's new evidence is neither "so strong that [this] court [does]not have confidence in the outcome of the trial," *Schlup*, 513 U.S. at 316, nor so strong that it rises to the level of proof, as *House*, 547 U.S. at 538, describes, that it is "more likely than not any reasonable juror would have reasonable doubt."

Accordingly, Trease's motions to dismiss counsel (Doc. 38 and 42) are **DENIED** and the respondent's motion (Doc. 37) to determine counsel's status is **DENIED**. Having determined in an earlier order (Doc. 26) that the application is untimely and having now determined that Trease fails to show actual innocence, the application under Section 2254 (Doc. 1) is **DISMISSED**.  The clerk must enter a judgment against Trease and close this case.

## DENIAL OF BOTH A CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Trease is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a COA, Trease must show that reasonable jurists would find debatable both (1) the merits of the

- 19 -

underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001). Because his application is clearly time-barred and because he shows no reasonable entitlement to the actual innocence exception to the statute of limitation, Trease is not entitled to a certificate of appealability and he is not entitled to appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**. Leave to appeal *in forma pauperis* is **DENIED**. Trease must obtain permission from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on March 7, 2024.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE